# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CARL JOSEPH JOHNSON, JR.,

        Plaintiff,

    v.                                          Case No. 09-C-0878

WARDEN LARRY JENKINS and WILLIAM McCREEDY,

        Defendants.

## DECISION AND ORDER

The plaintiff, Carl Joseph Johnson, Jr., is proceeding *pro se* on Eighth Amendment claims under 42 U.S.C. § 1983 that each of the defendants was deliberately indifferent to the exacerbation of the plaintiff's asthma, a serious medical need, by environmental tobacco smoke at Kettle Moraine Correctional Institution. Now before the court is the defendants' motion for summary judgment.

### I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II. BACKGROUND[1]

### A.   Parties

The plaintiff, Carl Johnson, was incarcerated at Kettle Moraine Correctional Institution (KMCI) from January 10, 2005, through October 18, 2006. On October 18, 2006, the plaintiff was transferred to Stanley Correctional Institution. He was released from prison on July 27, 2011, and he is currently on active community supervision status.

At the times relevant to this case, defendant Larry Jenkins was employed by the Wisconsin Department of Corrections as the warden at KMCI. Defendant William McCreedy is the Health Services Director at KMCI and has held that post since March 12, 2000.

### B.   Plaintiff's Medical History

On January 11, 2005, the day after the plaintiff arrived at KMCI, a progress note in his medical file indicated that the plaintiff had a history of asthma. His chart was given to a physician

---

[1] The facts are taken from the defendants' proposed findings of fact, to the extent they are supported by admissible evidence. These proposed findings of fact are deemed uncontroverted because the plaintiff did not respond to them individually and submitted nothing sworn in response to the defendants' motion for summary judgment. *See* Civ. L.R. 56(b)(2), (4) (E.D.Wis.2010); *see Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633-34 (7th Cir. 2005). Even *pro se* litigants must follow the rules of civil procedure. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).

2

for review and to set up an appointment. The plaintiff was seen by a physician on February 7, 2005, and the plaintiff reported that he was born with asthma and had gained a lot of weight in prison. The physician prescribed Advair for six months and noted the plaintiff's weight was more than 300 pounds.

A physician's note on March 30, 2005, indicates that the plaintiff asked to be transferred to a prison where he could have a restricted diet tray. This note does not mention any complaints about second hand smoke or exposure to smoke aggravating the plaintiff's asthma.

A nurse practitioner at KMCI completed an "Asthma Assessment" form for the plaintiff on June 20, 2005. She noted that the plaintiff had asthma since he was a toddler and that it continued into his adulthood. Based on the information and history provided by the plaintiff, the nurse practitioner found the plaintiff's asthma condition to be of moderate persistence. She completed a "Medical Restrictions/Special Needs" form that directed staff to allow the plaintiff to remain sitting for count if he was having an asthma attack or using his nebulizer. This form does not contain any restrictions concerning the plaintiff's exposure to second hand smoke. Finally, the nurse practitioner completed an "Asthma Self-Management Care Plan" for the plaintiff. The plaintiff was provided with an Advair inhaler and a rescue inhaler and nebulizer with Albuteral. He was instructed on the use of each medication.

The next mention of the plaintiff's asthma in his medical records is an asthma attack on January 10, 2006. The plaintiff admitted that he had not used his Advair inhaler; he said the inhaler makes his vision blurry.

A progress note dated May 9, 2006, states that the plaintiff's blood pressure was normal and lungs improved. It did not indicate that the plaintiff had complaints related to his asthma or second hand smoke.

3

Any time the plaintiff presented to KMCI with exacerbated asthma symptoms, he was assessed and provided with appropriate care, which typically included a nebulizer treatment available in the Health Services Unit, and then evaluated after the treatment to assess his airways and lung capacity. Although the plaintiff had a hand-held nebulizer in his cell, often coming to the Health Services Unit and having health care staff assure him and evaluate him, along with the cooler air in the unit, settled the plaintiff down, which helped his breathing and improved his response to the nebulizer treatment.

On September 13, 2006, the plaintiff voiced his first complaint directly to nursing staff concerning smoking and his asthma. He stated that he experienced some wheezing and coughing when he inhaled cigarette smoke when he walked in an area of officers smoking. As a result of this visit, the physician altered the plaintiff's medication to include prednisone, and the nurse practitioner stressed to the plaintiff that weight loss was important.

During a follow up visit on September 15, 2006, the nurse practitioner noted that the plaintiff was at the library when he was called for his visit. Therefore, the plaintiff had to travel back to the unit before making his way to Health Services Unit to be seen, which would be a fair amount of activity and cause someone with exacerbated asthmatic symptoms to show signs of distress. However, when the plaintiff arrived at the appointment, he was wearing a long-underwear shirt under his t-shirt and was cool and without respiratory distress, even though it was 78-degrees and sunny outside. The plaintiff was directed to continue the prednisone taper schedule as ordered by the physician. In the progress note about this visit, dated September 19, 2006, the nurse practitioner indicated that she was supportive of moving the plaintiff to a smoke free unit or institution, given his complaints.

The plaintiff was brought to the Health Services Unit on October 13, 2006, with an asthma attack. He requested to be to moved to a smoke free area. The plaintiff's asthma symptoms worsened and could not be controlled with the use of his inhaler or nebulizer. As a result, the plaintiff was admitted to St. Agnes Hospital on October 15, 2006. The treating physician at the hospital considered a sinus infection to be a contributing factor related to the plaintiff's exacerbation of the plaintiff's asthma symptoms. The physician recommended preliminary instructions for discharge which included a low fat, low cholesterol, low sodium diet. The physician also recommended light duty activities for one week, extensive counseling on asthma and asthma exacerbation, blood pressure checks, and accu/checks q.a.c. and nightly while patient is on oral steroids. The final discharge summary included all of the above and a directive to "[a]void any irritants including second hand smoke."[2]

## C.     Plaintiff's Complaints about Environmental Tobacco Smoke

On August 29, 2006, the plaintiff wrote a health services request asking for a transfer to a non-smoking institution, which was referred to defendant Warden Jenkins. Jenkins consulted with defendant McCreedy about whether there was a medical reason requiring the plaintiff's transfer. Because there was no medical directive that the plaintiff be transferred, nor any documented history of complaints of smoke by the plaintiff since arriving at KMCI, Jenkins did not issue an order to transfer the plaintiff to another institution. He sent the plaintiff a responsive memorandum on August 30, 2006, which states:

> Your Health Service Request form regarding tobacco smoke has been referred to me for response.

---

[2] This final discharge summary was provided by the plaintiff as part of the exhibits he filed on September 14, 2011. This final directive is not part of the preliminary discharge summary referenced by the defendants.

5

> Allowable smoking areas within an institution, including those for staff only, are at the discretion of the administration in conjunction with governing laws and union contracts. Staff are not subject to the same rules as inmates nor should they be.
>
> I have no concern with enactment of this latest institution no smoking policy and as it pertains to all inmates at KMCI; it is not discriminatory in nature. Though complainants may disagree with it, the fact remains the Warden is empowered to establish such policy in accordance with DOC 303.08.
>
> In addition, Mr. McCreedy, HSU Manager has confirmed there is no medical reason for you to be transferred from KMCI.

Affidavit of Larry L. Jenkins, ¶ 18, Exhibit 1011. On the same day, Jenkins reviewed the plaintiff's offender complaint asking for a transfer and dismissed it.

Although Jenkins had the authority to order an inmate transferred to another institution, this is not an action he took on a frequent basis, due to overcrowding issues and budget constraints of correctional institutions. It is not unusual for inmates to request transfers to other institutions for any number of reasons. However, because of space and available resources, and to keep comity, unscheduled transfers can only occur in an emergency situation or for a medical necessity.

McCreedy viewed the September 19, 2006, nurse practitioner note supporting the plaintiff's transfer to a non-smoking unit or institution as a statement of opinion by the nurse practitioner on the status of KMCI's smoking policy rather than as a directive or order to provide medically necessary treatment to the plaintiff. The nurse practitioner had the authority to issue a medical order that the plaintiff be moved to a smoke-free institution, but her progress note dated September 19, 2006, did not go so far as to issue such an order.

At the request of the nursing staff, McCreedy spoke to the plaintiff after his asthma attack on October 13, 2006. The plaintiff told McCreedy that his exposure to smoke bothered his asthma, but McCreedy felt the plaintiff was exposed to very little second hand smoke. McCreedy even went to

the library where the plaintiff complained he was exposed to smoke and saw that the windows were closed so that smoke could not enter the library. McCreedy also saw that the plaintiff's work area in the library was not located near the doorway, where a small amount of smoke exposure could have occurred. The plaintiff also told McCreedy that officers could smoke all over the place in his living unit, but McCreedy was aware of the policy that officers could only smoke in designated areas.

It is not uncommon for inmates to seek a medical justification to transfer or change their living conditions. Therefore, it is necessary for a medical provider to evaluate an inmate when a request is made to determine the appropriateness and/or necessity of such a request. In the plaintiff's case, no medical provider issued a directive that he be moved away from KMCI, despite the plaintiff's requests. Even after reviewing the records from St. Agnes Hospital, McCreedy believed that cigarette smoke at KMCI was not the cause of the plaintiff's exacerbated asthma condition.

On October 17, 2006, an early recall Program Review Committee was held for the plaintiff to evaluate custody, program, and placement issues. The Program Review Committee decided to retain the plaintiff's medium custody status and transfer the plaintiff to Stanley Correctional Institution or New Lisbon Correctional Institution, based on the inmates medical concerns as noted by the social worker. However, even after the plaintiff was transferred to Stanley Correctional Institution, a non-smoking facility, he continued to experience exacerbation of his asthma. In the year after his transfer from KMCI to Stanley Correctional Institution, the plaintiff was transported to the hospital for asthma attacks on four different occasions.

**D.     KMCI Policy**

While the plaintiff was at KMCI, the smoking policy prohibited inmates from smoking anywhere and staff were only allowed to smoke in designated areas outside of the buildings. The only exception to this was that officers in the general population housing units could smoke in the

enclosed officers' station areas on the housing units. This policy predated Jenkins' appointment as KMCI warden in December 2004.

On September 23, 2005, the Wisconsin Department of Corrections had advised employees of an initiative to ban all tobacco products from correctional facilities no later than September 1, 2006, and the KMCI staff was notified that the institution was to become tobacco free on May 1, 2006. However, a grievance filed by the employee union at KMCI stalled the implementation of the new policy. Jenkins worked hard to get the smoking policy changed much earlier, but the matter was still in arbitration when the plaintiff was incarcerated at KMCI. The arbitrator issued a decision in favor of the employees on October 12, 2006, and KMCI had to continue allowing staff smoking during rest breaks. Effective April 16, 2007, smoking by staff is allowed in designated areas only, which are outside the institution. There are no more inside areas designated for smoking by staff.

## III. DISCUSSION

The defendants submit that they are entitled to summary judgment because there is no evidence that environmental tobacco smoke (ETS) caused the plaintiff's serious medical condition and no evidence that the defendants were deliberately indifferent to a serious medical need. The plaintiff argues that the defendants' failure to remove the plaintiff from staff who were allowed to smoke violated the Eighth Amendment and that the denial of a transfer was so blatantly inappropriate as to evidence intentional mistreatment.

> Deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment, which applies to the states through the Fourteenth Amendment. The Eighth Amendment prohibits punishments that are incompatible with "evolving standards of decency that mark the progress of a maturing society." In order to prevail on a deliberate indifference claim, a plaintiff must show (1) that his condition was "objectively, sufficiently serious" and (2) that the "prison officials acted with a sufficiently culpable state of mind." A medical condition is serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

8

> would perceive the need for a doctor's attention." With respect to the culpable state of mind, negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense.

*Lee v. Young*, 533 F.3d 505, 509-10 (7th Cir. 2008) (internal citations omitted).

Asthma "can be, and frequently is, a serious medical condition, depending on the severity of the attacks." *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005). Thus, for the purpose of this motion, the court will assume that the plaintiff's asthma constituted a serious medical need while he was at KMCI. Additionally, even in the absence of medical experts, it appears that there is a question of fact regarding whether the ETS caused the exacerbation of the plaintiff's asthma. The court must then consider whether the defendants were deliberately indifferent to the plaintiff's serious medical need.

In *Lee*, the Court of Appeals for the Seventh Circuit affirmed the grant of summary judgment in favor of defendants in connection with a prisoner's exposure to secondhand smoke that allegedly triggered his asthma. *Lee*, 533 F.3d at 511-12. In that case, the court found that Lee's complaint, while valid, did not rise to the level of deliberate indifference or criminal recklessness on the part of the defendants. *Id.* at 511. "Prison officials are expected to 'act responsibly under the circumstances that confront them, but are not required to act flawlessly.'" *Id.* (quoting *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004)). "Significantly, in determining the best way to handle an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals." *Lee*, 533 F.3d at 511 (citing *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006)).

With regard to the two defendants named by the plaintiff, there is no showing of a sufficiently culpable state of mind. During his tenure as warden at KMCI, Jenkins worked to change the smoking policy, even when faced with an employee union grievance and arbitration that lasted years. He also

9

investigated and promptly responded to the plaintiff's August 29, 2006, request for a transfer. Although the plaintiff did not like the outcome, Jenkins' memo acknowledged the plaintiff's request and denied it, in part because McCreedy indicated that at that time there was no medical reason to transfer the plaintiff. *See Johnson*, 433 F.3d at 1011 (prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals).

Similarly, following the plaintiff's September 13, 2006, complaint, McCreedy investigated the plaintiff's contact with ETS and determined that a transfer was not medically required. McCreedy went so far as to visit the areas of the prison where the plaintiff lived and worked to observe the level of ETS in those areas. While another person may have come to a different conclusion, this process does not suggest deliberate indifference to the plaintiff's concerns or his asthma.

The plaintiff objects to McCreedy offering medical opinions and suggests that it is the unauthorized practice of medicine because McCreedy is a registered nurse and not a physician. However, McCreedy does not present himself as a physician and is entitled to draw medical conclusions based on his training as a registered nurse. Nurses are medical professionals. *Chavez v. Cady*, 207 F.3d 901, 905 (7th Cir. 2000) ("professional judgment standard applies in Fourteenth Amendment claims to decisions made by professionals such as physicians and nurses within their area of expertise").

In *Lee*, no prison doctor recommended that Lee be transferred to a different cell or a different prison facility with an entirely non-smoking wing, and medical professionals at the asthma clinic uniformly determined that Lee's asthma was "controlled." *Lee*, 533 F.3d at 511. Here, the nurse practitioner stated in a progress note that she would support a transfer, but she did not order a transfer, even though she had the power to do so. In any event, the plaintiff's transfer was

implemented by the Program Review Committee within a month of the nurse practitioner's note and within less than two months of the plaintiff's request for a transfer that was addressed by Jenkins. Allowing the Program Review Committee to take action in a timely matter, versus implementing an emergency transfer, does not constitute deliberate indifference.

## IV. ORDER

**NOW THEREFORE IT IS ORDERED** that the defendants' motion for summary judgment (Docket #87) be and hereby is **GRANTED**; and

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment dismissing this case.

Dated at Milwaukee, Wisconsin this 8th day of August, 2012.

                                      **BY THE COURT:**

                                      s/ William E. Callahan, Jr.
                                      WILLIAM E. CALLAHAN, JR.
                                      United States Magistrate Judge